## POND *vs.* WADSWORTH.

1. When the property of the surety, by his consent, is sold under execution against his principal (the surety not being a party to the judgment), and is bought in by the principal, through an agent, and sent back to the surety's house, the principal, although he afterwards pays the debt under which the property is sold, cannot invoke the doctrine of estoppel to defeat the surety's title.

2. If the transaction was intended by the principal and surety, both being insolvent at the time, to hinder and delay the creditors of the surety, the agent who became the purchaser would hold the property against both parties, and might dispose of it as he pleased; if he did not participate in the fraud, but acted in good faith as agent of the principal, the agreement being a fraud on the surety's creditors, the principal's title would prevail against the surety, and the fact that the latter afterwards acquired the possession, would not prevent a recovery by the principal, in the absence of all proof that he acquired it under a contract with the principal; the maxim "*in pari delicto potior est conditio possidentis*," does not not apply in such case.

3. The act of the agent, in sending the property back to the surety's house, where the principal also lived, if intended as a delivery to the principal, would vest the title in him by the delivery, and nothing could pass by a subsequent bill of sale to his administrator in trust for his estate; but the acceptance of such a bill of sale by the administrator would not preclude him from deducing title through his intestate under the previous sale consummated by delivery.

ERROR to the Circuit Court of Montgomery.

Tried before the Hon. ROBERT DOUGHERTY.

DETINUE for certain slaves, by the plaintiff in error, as

administrator of Lewis W. Pond, against Margaret Wadsworth, who claimed them as administratrix of Francis L. Wadsworth, deceased. The substance of the testimony adduced on the trial is stated at length in the opinion, and need not be detailed here. The court charged the jury, substantially, as follows :

" If the jury should believe, from the evidence, that Wadsworth was not a defendant in the execution under which the negroes were sold, by the sheriff, but was liable on the original debt only as the surety of said L. W. Pond, and was the owner of said slaves at the time the sheriff received said execution ; that Wadsworth, or said Pond by his consent, delivered the slaves to the sheriff to be sold, and the proceeds to be applied to the payment of said execution ; that said Pond procured Figh to purchase them, and furnished him with money to do so ; that Figh bid them off at the sale, and paid off said execution with money furnished him by said Pond ; and that the sheriff, at the request of Pond, made the bill of sale to Figh, then, although this was done to hinder and delay creditors, yet the legal title to the slaves vested in Figh, and was still in him, unless he had parted with it by his bill of sale to the plaintiff, which was in evidence before them. If the jury should believe that the slaves went back to Wadsworth's possession after the sheriff 's sale, his possession was in subordination to Figh's title; but if he afterwards, and before the execution of Figh's bill of sale to the plaintiff, while still in possession, claimed them as his own, and asserted title to them, then his possession would be adverse, and Figh's conveyance to the plaintiff would not vest in him such title as would enable him to maintain this action.

The plaintiff excepted to these charges, and asked the court to charge :

1. That, if the jury believed that Wadsworth consented that the sheriff should sell the slaves under said execution, and they were so sold accordingly, and Figh, at the request of Pond, purchased them for him, and sent them back to Wadsworth's house by Pond's order ; and that Pond paid the money bid at the sale by Figh, then they must find for the plaintiff, unless they were satisfied that Pond, with or without deed, had re-conveyed the slaves to Wadsworth.

2. That to constitute such adverse possession, as would prevent Figh from making a conveyance to the plaintiff, the

defendant must show that Wadsworth was in possession of the slaves, asserting title to them in good faith, and that Figh knew of such claim before he executed said conveyance to the plaintiff.

3. That, if they believed the sheriff sold sold slaves by the authority or consent of Wadsworth, and by his consent the proceeds of the sale were to be applied to the payment of said execution then in his hands; and that Figh bought them at the sale at Pond's request, and for Pond, and received them from the sheriff, and sent them to the place directed by Pond; and that Pond paid the money, or gave it to Figh who paid it to the sheriff, to be applied to the payment of the execution, then these facts vested the title in Pond, and no deed from the sheriff was necessary, and plaintiff would be entitled to a verdict, unless Pond afterwards sold or conveyed the slaves to some other person.

4. That if Wadsworth was insolvent, and an arrangement was made between him and Pond, with intent to hinder and defraud the former's creditors, and to cover up his property from the payment of his debts, to the effect that the negroes should be sold by the sheriff under the execution against Pond; and if the negroes were so sold by the sheriff, and were bought in by Figh, at Pond's request, and for him; and if Pond paid the purchase money to Figh, and Figh paid it to the sheriff, to be applied to the execution under said arrangement between Pond and Wadsworth; and if a part of said arrangement was, that Pond should buy and hold said slaves for Wadsworth, or for his wife and children; and if Figh received them from the sheriff, and sent them to the place directed by Pond, this was a · sale and delivery to Pond, and vested the title in him.

5. That although Wadsworth was asserting title to the slaves at the time Figh made the deed to plaintiff, if his assertion or claim of title was in consequence of an agreement between him and Pond, made to hinder and delay his creditors, that the slaves should be sold under said execution against Pond; and if the arrangement between them, as to who should purchase and hold the legal title, was left to Pond, and Pond got Figh to bid for him, but took the deed in his own name; and if the said arrangement was, that Pond, after all these things had been done, should give the slaves back to Wadsworth, or to his family, then Wadsworth's possession was not adverse, because

not in good faith, and they must find for plaintiff, unless they were satisfied that Wadsworth had acquired another title before the conveyance.

6. That if the negroes were sold by the sheriff, by the authority of Wadsworth to apply the proceeds to said execution then in his hands, and the proceeds were so applied by Figh, who became the purchaser at Pond's request, and a deed was made to Figh by the sheriff, and Wadsworth knew that Figh had become the purchaser at said sale, then, although Wadsworth asserted title against Figh at the time the latter conveyed to the plaintiff, this was not a *bona fide* claim of title, so as to constitute adverse possession, if there was no evidence of any conveyance or the acquisition of a new title by Wadsworth.

The court refused each one of these charges, and the plaintiff excepted to each refusal; and he now assigns for error the charges given and the refusals to charge as requested.

ELMORE & YANCEY, and N. HARRIS, for plaintiff in error :

The first charge given by the court was erroneous ; because : 1st. It determined that the title vested in Figh, and excluded from the jury all inquiries as to the effect of the evidence of delivery by Figh to Pond.—Nabors v. Camp, 14 Ala. 464 ; Carlisle v. Hill, 16 *ib.* 398 ; 21 *ib.* 9. 2. It determined that a delivery would not pass the title from Figh to Pond, although Pond was the purchaser ; but we insist, that Figh being the agent of Pond, the delivery to Figh was the delivery to Pond.

2. The second charge given was wrong ; because : 1. It excludes from the jury the character of Wadsworth's claim of title—whether *bona fide*, or one of which Figh had notice, or whether Wadsworth had disclaimed holding under Figh. As to the claim in good faith, see Hinton v. Nelms, 13 Ala. 229 ; Herbert v. Hanrick, 16 *ib.* 598; Abercrombie v. Baldwin, 15 *ib.* 363. As to the disclaimer and notice to Figh, see Harrison v. Pool, 16 Ala. 167 ; Hinton v. Nelms, 13 *ib.* 229 ; 18 *ib.* 26. It was proved that Figh had no notice of the claim set up by Wadsworth. There was no evidence of disclaimer by Wadsworth, or acquisition of any new title. 2. It decided that Wadsworth's possession was adverse, when Figh made the release to the plaintiff; and this is a question of fact for the jury.—McMasters v. Bell, 2 Penn. 180 ; 8 S. & M. 77 ;

Hinton v. Nelms, 13 Ala. 229 ; Herbert v. Hanrick, 16 Ala. 594; 21 Ala. 151. 3. It overlooked the fact, that, if Wadsworth held in subordination to Figh's legal title, he held in subordination to Pond's use ; and this was such an interest in Pond, that Figh's release to his administrator would vest the legal title in him, although there had been an adverse possession.

3. Both charges, taken together, decide that, although Pond had the use, and there was a delivery to him by Figh, Pond's administrator could not maintain the action on this possession. We insist, that, on the facts, Pond could have resisted a recovery against him by Figh ; and we are inclined to think, Wadsworth could have done the same, as the facts show a title in Pond. If it be said, this was a trust for Pond, then the delivery by Figh to Pond was an execution of the trust, and the title was in him.

4. The first and third charges refused could be denied, only on the ground that a delivery was insufficient, but a deed in writing was necessary to pass the title from Figh to Pond.

5. The second and sixth charges refused could be denied, only from overlooking or mistaking the laws as to adverse possession.

6. The fourth and fifth asked could be refused only on two grounds : 1st, that delivery was insufficient to pass the title ; 2nd, that the fraud against Wadsworth's creditors, enured at once on the sale to the benefit of Wadsworth, without any act being done by Pond. If it is said, here was a delivery to Wadsworth, and an execution of the fraudulent trust, then the court assumed the delivery to Wadsworth, and assumed a further fact, that it was a delivery for this purpose, as a delivery for any other purpose would not have been in execution of the trust. This, however, was a question of fact, which should have been left to the jury, and the charge did present this question to their consideration.

7. It is said, however, that the only interest acquired by Figh from the sale is that set forth in the bill of sale. We may admit this, as, in fact, we insist Figh never acquired any interest by the sale. He was the agent of Pond. The question is, not what interest was conveyed by the bill of sale, but what interest passed by the sale and delivery. There was no agreement that Pond should buy the negroes ; but that they should

be sold, and if a third person had bought, what estate would he have acquired ? Pond, by the purchase, acquired precisely the same interest, and the bill of sale made by Newman does not affect that interest. No bill of sale was necessary, the facts passed the title of Wadsworth, and that Newman made a mistake in the bill of sale, either as to the character of the title or interest he. was conveying, or the character in which he conveyed, cannot affect the purchaser's rights. Newman purports to convey as sheriff negroes levied on under execution against Pond as his property. The fact is, he sells the negroes as the agent of Wadsworth, and as such agent makes no paper conveyance, but conveys by delivery. The delivery, then, passed all Wadsworth's title. A bill of sale is made afterwards, conveying Pond's title as held before the sale. Does this avoid the title given by delivery, or impair it ? But it is said, Newman makes this by Pond's directions. Pond directs Newman to make to Figh the title acquired by the sale, but Newman does not obey these directions, but gives a different conveyance. Pond did not direct Newman to draw up this paper in the form in which it appears, but to make the titles to Figh. It does not appear that Pond ever saw the bill of sale. It may be urged that this direction by Pond, being given after the sale, was authority to Newman to convey the title to Figh that Pond acquired by the sale, and this then passed all Pond's interest. Such an argument needs no answer. The whole transaction resulted in this : the negroes became Pond's by the sale, and he became indebted to Wadsworth for the price they brought, or their value, according to the agreement between them.

WATTS, JUDGE & JACKSON, and S. F. RICE, contra :

Upon the facts stated in the bill of exceptions, the plaintiff never can recover ; and when this is shown, this court will not reverse, even should there be error in the rulings of the court below to which exceptions were taken.

The title to the negroes was in Wadsworth, as is admitted, up to the time of the sale by Newman ; but the plaintiff contends, that his testator acquired title by virtue of the proceedings at the time of sale—that Wadsworth's consent to the sale by Newman under the execution in his hands, and the fact that

Newman did sell, divested the title out of Wadsworth, and placed it in Pond or Figh. This position depends for its force on the doctrine of estoppel *in pais*; and to constitute such an estoppel, three things are necessary : first, that the person against whom the estoppel is invoked has done some act, or made some declaration, inconsistent with the truth, with a design to influence; second, that the person alleging the estoppel was ignorant of the truth, was influenced by such act or declaration, and acted on it; and, third, that an injury will result to the party alleging the estoppel, if the other party is allowed to show the truth : fraud and injury must concur to constitute an estoppel *in pais*.—Martin v. Angell, 7 Barb. S. C. R. 407 ; 32 Maine R. 127 ; Steele v. Adams, 21 Ala. 534, and plaintiff's brief in that case; Hunley v. Hunley, 15 Ala. 91 ; Pounds v. Richards, 21 Ala. 424. The facts here show that neither Pond nor Figh ever was in a position to invoke the doctrine of estoppel. They knew all the facts; neither one of them was influenced by any act or declaration of Wadsworth's ; neither paid any purchase money ; neither will be injured by the assertion of the truth. All estoppels, legal or equitable, are founded upon the great principles of morality and public policy.—Jones v. Sasser, 1 Dev. & Bat. 464. Estoppel will not be extended to accomplish a fraudulent object.—Pennell v. Hinman, 7 Barb. S. C. R. 643 ; Marshall v. Pierce, 12 N. H. 127.

If the doctrine of estoppel applies at all, it must apply to Pond and Figh. The sheriff's deed to Figh conveys only Pond's interest in the negroes, and not Wadsworth's.—1 Dev. & Bat. 464, *supra* ; 8 S. & R. 92. There is no transfer of title by operation of law.—17 Mass. 240 ; 9 *ib.* 138 ; *ib.* 242 ; 14 *ib.* 20 ; 13 *ib.* 483 ; 1 *ib.* 86.

The deed from Figh, if available for any purpose, does not aid the plaintiff in this suit. He declares as administrator of Lewis W. Pond, while the deed (if good at all) conveys the title to him individually, and was executed since the death of his intestate.—Glesson v. Herring, 2 Dev. 156. But the deed itself is void, by reason of Wadsworth's adverse possession. The rule holding good faith to be an element of adverse possession, has no application as between confederates in fraud.—Pryor v. Butler, 9 Ala. 418 ; McDougald v. Scroggins, 8 *ib.* 383.

34

No title passed out of Wadsworth · by what is called the sheriff's sale. That sale was a sham, not seriously entered into, and not intended to be operative (Baker v. Pope, 7 Ala. 161 ; 1 Dev. & Bat. 574) ; or it was made to defraud creditors, and the law will not allow its process and officers to be thus used in changing a title from one party to his confederate in fraud.—Boyd v. Barclay, 1 Ala. 34 ; McGehee v. Lindsay, 6 Ala. 16 ; U. S. Bank v. Owens, 2 Peters 527 ; Pennington v. Townsend, 7 Wend. 280 ; Thompson v. Davies, 13 Johns. 112 ; Fambro v. Gantt, 12 Ala. 298 ; 1 Foster's R. 312 ; 5 Mason's R. 465, 479, 495 ; 1 Missouri R. 754 ; Coxe's (N. J.) R. 39 ; Herd v. Renfro, 14 Ala. 23 ; Riner v. Stacy, 8 Humph. 288.

The second charge asked excluded from the consideration of the jury all right, on the part of Wadsworth, to dispute Figh's title to the property, except on the ground of adverse possession : it assumes, as a fact, that Wadsworth must have held under Figh, if he held after the sheriff's sale. It excludes from the consideration of the jury the question whether L. W. Pond, or his administrator, had notice of the adverse possession. All the other charges asked are substantially the same, and were properly refused ; they are all based on portions of the testimony, and exclude the other facts in evidence from the consideration of the jury.—Nabors v. Camp, 14 Ala.

CHILTON, C. J.—It will better comport with that brevity which it is desirable to maintain in judicial opinions, to lay down the rules of law applicable to this case, by which the numerous charges must be tested, than to proceed with an analysis and examination of each charge separately.

1. The facts are briefly these : Wadsworth, the defendant's intestate, owning the slaves now sued for, consented that Newman, the sheriff of Montgomery County, might sell them, without levy or advertisement, under an execution in his hands in favor of John · & Walter Lockwood, for $3,517 69 damages, besides cost, and ten per cent. damages awarded upon the affirmance of the judgment in this court ; which execution was against Lewis W. Pond, William A. Campbell, Henry Furniss and J. P. Figh. The proof conduced to show, that Wadsworth was a party to the demand on which the judgment was rendered,

but was the surety of said L. W. Pond. The slaves, owned as above stated by Wadsworth, were, by the consent of himself and Pond, sold by Newman, and Figh, at the request of said Pond, bought them for him (Pond), but paid no money, until some time thereafter. Immediately after they were bid off by Figh, he asked Pond what he should do with said slaves, and Pond told him to send them back to where they came from.—— Thereupon, Figh immediately sent them to the residence of Wadsworth, at which place Pond was then boarding, and where he remained for some years, and until about a year before his death, when he boarded elsewhere. The negroes remained in the possession of Wadsworth, and one of them was hired out by the sheriff who sold them, subsequently to the sale; he acting as the agent of Mrs. Wadsworth, to whom he paid the money for the hire.

It appears that, at the time of the sale, both Pond and Wadsworth were insolvent, and executions against them had been returned " no property found" &c. It also appears, that the execution, under which the slaves were sold, was issued on the 8th November, 1847 ; the bill of sale by the sheriff to Figh is dated on the next day (9th November) ; and the execution is credited with the receipt of $3,418, besides costs and sheriff's commissions, on the 10th of the same month. Figh, who had purchased or bid off the slaves for Pond, received the money from the latter, and paid it over to the sheriff, and never executed any instrument in writing to Pond ; but after his (Pond's) death, Figh executed a bill of sale to the plaintiff in error, who was his administrator with the will annexed, purporting to be for one dollar, and to convey the slaves to him in trust for L. W. Pond's estate. Before this last named bill of sale, which bears date in January, 1851, Wadsworth claimed the slaves, being then in the possession of them, as his own property.

This is the substance of the testimony, which was submitted on both sides.

If it be conceded, that Pond was the principal debtor in the execution, to satisfy which these slaves were sold, and Wadsworth was but his surety upon the original demand, and no party to the execution, it was the duty of Pond to indemnify and protect Wadsworth against his liability ; and if the latter consented to allow his slaves to be sold, by an informal sale

under the execution, as the property of Pond, and Figh purchased them at the request of, and for Pond, who sent them back to Wadsworth, from whose possession they came, Pond would not be in a condition to invoke the doctrine of estoppel to defeat Wadsworth's title. He has given nothing for the slaves, has parted with nothing, and suffered no detriment by reason of Wadsworth's consent to their sale as his property. True, he has paid the debt ; but this he was bound to do, and the mere ceremony of having the slaves sold, and bidding them off and returning them back to Wadsworth's, could not invest him with title. Estoppels are not favored in law, as they " conclude a party by his own act or acceptance, *to say the truth*" (Co. Litt. 352 a.) ; and with respect to estoppels *in pais*, they should never be allowed to preclude the investigation and ascertainment of truth, unless the party insisting upon them can do so in good faith, and unless the affirmance of the untruth of the matter set up as an estoppel would work wrong or injustice to the party whose conduct was influenced by it.

It is very clear, that had the facts been ascertained, as the evidence *conduced* to show them, the doctrine of estoppel could not have precluded Wadsworth's administrator from setting up his title. Wadsworth's slaves, by his gratuitous consent, were sold as the property of Pond. We may concede that, had a stranger have purchased, trusting to such consent, and have parted with his money on the faith of it, his title would have been good ; otherwise, he might be greatly injured and defrauded. But Pond buys them, through his agent, Figh. He buys, as his bill of sale purports to convey, all the interest which he (Pond) had in them before the sale. What interest did he then have ? None ; then he bought none. The property remained precisely in the same condition after as before the sale. It would be a strange application of the doctrine of estoppel, to hold that, because a surety consented that his property might, for the purpose of a sale under execution, be treated as the property of the principal debtor, such principal might buy it in, and hold it, as having *purchased his own property, the consideration for it being the payment of his own debt*, which justice and good faith to the surety required he should have paid, thus avoiding a sale, and releasing the surety. The bare statement of the proposition shows, that to allow the principal to set up

such consent as an estoppel, would operate a fraud upon the surety, divesting him of the title to his slaves, which it was the duty of the principal to protect and maintain by the payment of the debt, and vesting that title in the defaulting principal, without the payment of one cent, or the doing of any act which the law, without such sale, did not require. There is no such potency in the mere ceremony of a sale by the sheriff. Nor does the fact that Figh bid off the slaves make any difference. He was the agent of Pond, the mere conduit, as was doubtless supposed, through whom the title could more securely pass.— So far as he, Figh, was concerned, the slaves vested in Pond, when he sent them to Wadsworth's by Pond's direction ; this was a delivery to Pond, and they were no longer at the risk of Figh. The bill of sale which he executed, in 1851, to the administrator of Pond, was but an attempt to furnish written evidence of a transaction consummated long before ; for, had the slaves died after they were delivered by sending them to Wadsworth's, it is too clear to admit of doubt that the loss would not have fallen on Figh. The title of Pond derives no additional strength by reason of its passing through Figh, who, as we have said, had no interest in the slaves, except as a mere naked trustee for Pond, after the amount which he bid was paid by the latter.

2. Having considered the law of the case, as applicable to the facts hypothetically stated as above, as it is insisted by the counsel that the proof justifies the presentation of it in another aspect, without expressing any opinion upon questions of fact, we proceed to consider the case upon the hypothesis for which they contend.

It is argued, that, Wadsworth being insolvent as well as Pond, the object of both parties in consenting to the sale by Newman and the purchase by Figh, was, to place the slaves out of the reach of Wadsworth's creditors, and thus to defraud them.

If the proof should sustain this hypothesis, then it is clear that Figh could have held the slaves, both as against Wadsworth and Pond. The law holds such transactions, as to creditors and *bona fide* purchasers for a valuable consideration, to be void ; but as between the parties themselves, such sales are valid and binding. It follows, if Figh had a good title as

against Wadsworth, he had the right to vest that title in Pond; and his title, as against Wadsworth, was good and available, if his purchase was made under an agreement with Wadsworth and Pond, or with Wadsworth alone, that he should bid them off and hold them, or vest the title by transfer in Pond, to screen the property from liability to Wadsworth's debts.

If, on the other hand, Figh did not in any way participate in the transaction with any fraudulent design, and bought the property in good faith, as the agent for Pond; yet, if it was agreed between Wadsworth and Pond, that the property should pass through the ceremony of a sale under execution as Pond's property, and should be bought in by Pond, either personally, or through his agent, and held by him or his agent, *in order to delay, hinder or defraud the creditors of Wadsworth*, in such case, the title of Pond would avail as against Wadsworth, notwithstanding he was the principal in the debt on which the judgment and execution were founded.

Neither would the fact that Wadsworth afterwards came to the possession of the slaves, in the absence of any proof of a contract or agreement by which he acquired them from Pond, prevent a recovery by the latter : that is to say, the maxim, "*in pari delicto, potior est conditio possidentis*" has no application to such case; for, as between the parties, the law pretermits the fraud, or, if it regards it, does so for the purpose of holding the fraudulent vendor to his sale, thus punishing his fraud by the forfeiture, as it were, of his property so fraudulently disposed of.

3. In regard to the validity of the bill of sale from Figh to the plaintiff in error, it is only necessary to remark, that if Figh bought the slaves as the agent of Pond, and called upon him to know what he should do with them, and was directed to send them to Wadsworth's, where Pond also lived, and this was intended as a delivery to Pond, the title would, under the second aspect of the facts in which we have considered this case, have vested in Pond; and Figh, having parted with his title by this verbal delivery, could have conveyed none to the administrator by his bill of sale in 1851. But, conceding that the title did not pass by the verbal arrangement, and that it was understood between the parties that the transfer should not be consummated until a bill of sale was executed, still the instrument found in

the record does not vest the legal title in the administrator *as such*, although it purports to do so.   He takes the property, if at all, as an individual, while he has the equitable right to it as administrator.   He is the representative of the deceased, in respect "of the goods and chattels, rights and credits which were of the deceased *at the time of his death*."   Such rights as he acquires subsequently to that period, he takes as an individual, but, it may be, as a trustee for the estate which he represents.

It is proper to remark, however, that the fact of accepting a bill of sale by Martin Pond, the administrator, of Figh, does not preclude the administrator from deducing a title through his testator by virtue of a consummated sale by Figh to him.— Estoppels must be mutual ; and as the administratrix of Wadsworth is not bound by the bill of sale, so she can take no advantage of it.

The law, as given in charge by the court, does not accord with the views we have above expressed.

The first charge given, excludes from the consideration of the jury the evidence as to whether Figh made a delivery and consummated transfer of the slaves to Pond immediately after his purchase, as some of the proof conduced to show.   Upon the hypothesis that the sale was made to delay and defraud creditors, and that Figh bought at Pond's request, and paid for the slaves with Pond's money, the charge left the title in Figh, unless it was divested out of him by the bill of sale to the administrator of Pond.   This was erroneous, as restricting the plaintiff's right of recovery to a partial view of the facts, and rendering it unnecessary for the jury to consider other proof tending to show that the title had passed out of Figh, independent of the bill of sale to Martin Pond.

We forbear, however, a further comment on the several charges, as the principles we have stated will be sufficient to guide the primary court in the further progress of the cause.

Let the judgment be reversed, and the cause remanded.

GOLDTHWAITE, J., not sitting.